# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ZOFIA KUC,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.** |
| ) | **19-11402-FDS** |
| **v.** ) | |
| ) | |
| **SMITH & NEPHEW, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

SAYLOR, C.J.

This is an action for workplace discrimination and retaliation under Massachusetts law.
Jurisdiction is based on diversity of citizenship.

From 2008 to 2016, plaintiff Zofia Kuc was an employee of defendant Smith & Nephew,
Inc., a manufacturer and distributor of medical devices and related products. She worked as a
"quality associate," conducting quality-control inspections throughout Smith & Nephew's
manufacturing and packaging processes. She was terminated in late March 2016 for what the
company says was unacceptable performance, and what she says were unlawfully discriminatory
reasons.

This case involves a tangle of intersecting allegations and issues that makes analysis of
the specific claims asserted by plaintiff somewhat challenging. To begin, there is substantial
evidence in the record that Kuc was an unsatisfactory employee. According to the company, in
2014 and 2015, she repeatedly failed to conduct required inspections and on one occasion
created a falsified document indicating that an inspection had occurred. On March 10, 2016, she

again failed to perform an inspection but recorded on a form that she had.  She was removed from her inspection duties on March 14 and terminated eight days later, on March 22.

There is also, however, substantial evidence in the record that during her employment, Kuc had been harassed by her co-workers due to her Polish origin and accent.  She alleges that she reported incidents of harassment to her supervisors, but the company never took any action in response.  She contends that the harassment affected her job performance, which in turn affected the quality of her work.  She also alleges that her termination was in retaliation for the fact that she reported the harassment to her supervisors.

Complicating matters further, in the immediate aftermath of the March 10 incident that led to her termination, Kuc filed a request for medical leave.  She claimed that beginning on March 11—the very next day—she suffered severe, "sudden onset" knee pain that completely prevented her from working, and requested indefinite leave as a result.  The company denied her request.  There is no evidence of handicap discrimination in the usual sense—that is, that she was qualified to perform the work and the company refused to provide a reasonable accommodation to enable her to do so.  Instead, she asserts that she was terminated in retaliation for requesting the leave.  The company contends that it was in the process of terminating her based on the March 10 incident, and that her last-second request for leave was irrelevant to that decision.

Finally, Kuc also claims that she suffered discrimination on the basis of sex (as to which the evidence is clearly insufficient) and discrimination on the basis of age (as to which there is no evidence at all, and indeed such a claim is not even pleaded in the complaint).

Smith & Nephew has moved for summary judgment as to all claims.  For the reasons set forth below, the motion will be granted in part and denied in part.  Specifically, summary judgment will be denied as to the claims of (1) national-origin discrimination, resulting in (a) a

hostile work environment and (b) termination; and (2) retaliation for complaining about a hostile

work environment, resulting in termination.  The motion will otherwise be granted.

## I.   Background

### A.   Factual Background

The following facts are stated as set forth in the record and are undisputed except as

noted.

#### 1.   The Parties

Zofia Kuc was born in Poland and emigrated to the United States as an adult in 1978 or

1979.  (Kuc Dep. at 13, 31).  After living in Tennessee for several years, she relocated with her

husband to the Massachusetts area in 1995.  (*Id.* at 33).  She then began working in quality-

control positions at various companies.  (*Id.* at 33-35).  She is currently a Florida resident.  (Am.

Compl. ¶ 1).

Smith & Nephew, Inc., is a manufacturer and distributor of medical devices and related

products.  It maintains a manufacturing facility in Mansfield, Massachusetts.  (SMF ¶¶ 1, 3).

#### 2.   Kuc's Employment at Smith & Nephew

In 2006 or 2007, Smith & Nephew hired Kuc as a temporary employee in its quality-

control department.  (Kuc Dep. at 38).  In February 2008, she was hired as a full-time employee

to an entry-level position, Quality Inspector I, at the Mansfield facility.  (*Id.* at 38-40, 47).

Kuc was part of a quality-control department responsible for inspecting products

throughout the manufacturing process.  She was trained in a variety of procedures and protocols,

enabling her to work across different inspection categories.  (*See* SMF ¶ 18; ECF No. 43-6).[1]

In general, Smith & Nephew quality-control personnel perform three kinds of

---

[1] Because the parties do not uniquely identify exhibits, the Court will refer to exhibits by their electronic case filing numbers to minimize confusion when citing to the record.

inspections.  First, because the company utilizes component parts from outside suppliers, it uses quality-control personnel to conduct "incoming inspections" of those components before they are incorporated into the manufacturing process.  (Black Dep. at 13-14).  Second, the company inspects its products during the manufacturing process, in what are called "in process" inspections.  (Molina Dep. 128-29).  Third, when a product is complete, it is subjected to a "finals inspection."  That inspection consists of a review of all paperwork accompanying the product to ensure that all component parts are present and that the product underwent all required inspections during its manufacture.  (Molina Dep. 48-49).

During an in-process or finals inspection, the inspector may be required to perform a procedure called a "Positive Lot Release."  (SMF ¶ 30; ECF No. 42-3 at 20-24).  Part of that procedure requires the inspector to verify a product's paperwork by checking an electronic database that tracks its component parts.  (ECF No. 42-3 at 22).  That verification, which prevents a product from being shipped until all its component parts are included, is known as an "MB 24/25" check.  (SMF ¶¶ 33-36).[2]

### 3.    Kuc's Work Performance

From 2009 to 2012, Kuc's performance evaluations rated her as consistently meeting expectations, although she never received exceptional performance ratings.  (ECF No. 54-1 at 13-25).  From August to November 2013, the Quality Control Manager, Peter Furafi, worked with Kuc on a job-skill progression plan.  (ECF No. 54-1 at 27).  Furafi believed that she had made progress that year and that meetings concerning her performance should continue in the future.  (*Id.*).  She contends that Furafi's successor, Frank Bellomo, did not continue those

---

[2] The parties at times refer to the checks as "MB 24," "MB 25," or "MB 24/25."  There does not appear to be any relevant difference between the two checks, and accordingly the Court will refer to the database verification as the "MB 24/25 check."

meetings.  (Kuc Decl. ¶¶ 54-55).

In her 2013 annual review, Furafi again gave Kuc an overall performance rating of "consistently meets expectations."  (ECF No. 54-1 at 7).  He noted, however, that she was unwilling to receive feedback on her work, that she took breaks that were longer than permitted, and that she worked overtime that had not been authorized.  (*Id.*).  Kuc disagreed with the evaluation and refused to sign it.  (*Id.* at 8).

According to the company, a number of deficiencies in Kuc's work performance were noted in 2014.  In March, she failed to complete an MB 24/25 check, resulting in a product being approved despite lacking its required materials.  (ECF Nos. 42-7 at 44, 44-1 at 3).  Kuc does not dispute that she failed to conduct that inspection.  (Pl.'s SMF ¶ 51).

In June 2014, she repeated that mistake during a finals inspection by approving a product that was missing its component screws.  (ECF No. 43-2).  When the error was discovered in July 2014, Kuc was told that she needed to perform an MB 24/25 check on all work orders.  (*Id.* at 3).  She said, at that time, that she could not find her record of that inspection and that she always performed the MB 24/25 check.  (*Id.* at 2).  She offers no evidence, however, that she did so in that specific instance.

In response to the June 2014 incident, quality-control personnel alerted human resources by email that Kuc had been informed about her inspection mistakes but that she appeared resistant to accepting responsibility for them.  (ECF No. 44-1).  That email acknowledged that it was not unusual for an inspector to make two or three inspection mistakes a year.  (*Id.*).  However, the email referred to eight inspection errors that Kuc had committed in 2014 alone.  (*Id.*).  Kuc does not dispute that she made those eight errors.  (Pl.'s SMF ¶ 60).

In February 2015, Kuc was asked to remove candy from her work area on the ground that

it violated company policy.  (ECF No. 43-7 at 8).  She responded that a coworker kept food in his area.  (*Id.*).

In December 2015, Kuc was inspecting a series of identical parts.  (Pl.'s SMF ¶ 62).  As part of that inspection, she was required to use a gauge to inspect every tenth piece in the series. (*Id.*).  The form on which that kind of inspection is recorded, the "Data Collection Sheet," requires the inspector to initial the appropriate box after each individual inspection.  (*Id.* ¶ 63). Therefore, a completed "Data Collection Sheet" shows a series of initials signifying that every tenth piece of the series had indeed been inspected.

According to the company, Kuc signed a blank Data Collection Sheet without recording the individual inspections she was supposed to perform.  (ECF No. 43-3).  Kuc contends that she signed the data collection sheet after "she completed the [gauge] management."  (Kuc Decl. ¶¶ 64-65).  She says that she did this because it was nearly time for her lunch break, and she planned to meet with an operator after lunch to have him complete the form.  (*Id.*).  She contends that signing the form, despite not having conducted the required inspections, nor even planning to conduct them herself, was not a violation of the company's policy.  (*Id*. ¶ 67).

Quality Control Manager Brandon Molina wrote a memorandum to human resources to record the infraction in Kuc's personnel file.  (ECF No. 43-4).  The memorandum stated that her signing of a blank inspection form violated both the internal procedures of Smith & Nephew and federal regulations.  (*Id.*).  Molina also wrote that her actions constituted the falsification of an inspection record and that she had been previously trained on proper documentation practices. (*Id.*).  That is corroborated by her training records.  (*See* ECF No. 43-6).

Human Resources Manager Dan Briggs noted on the memorandum that the incident was discussed with Kuc and that she was given a final warning that falsifying documents in the future

could result in termination.  (ECF No. 43-4).

### 4.        The March 10, 2016 Incident

According to the company, on March 10, 2016, Kuc again failed to complete an MB 24/25 check during an inspection.  As a result, she approved a product that lacked all its required materials.  (ECF No. 43-5 at 3).  Brandon Molina asserted that Kuc had indicated on the routing form for the product that she performed a procedure called "Positive Lot Release Per 1430103." (*Id.* at 2).  That procedure, for which she had received training, required an MB 24/25 check. (ECF Nos. 43-5; 43-6; Molina Decl. ¶¶ 9, 22-24).

When the inspection error was discovered, Kuc asserted that the MB 24/25 review for that product had not been her responsibility.  (ECF No. 43-5).  She also contended that she had not been trained to conduct an MB 24/25 verification for the specific category of product she had been inspecting that day.  (*Id.*).[3]  She did not, however, contest the fact that she had recorded on the routing form that she performed a "Positive Lot Release" procedure for that product.  (ECF No. 43-5).  And her training record indicates that she had been trained twice on Positive Lot Release Per 1430103, albeit earlier versions of that policy.  (ECF No. 43-6).  The standard operating procedure for Positive Lot Release Per 1430103 provides that an MB 24/25 check is a necessary step in that inspection.  (ECF No. 42-3 at 22).  Furthermore, Kuc admits that the MB 24/25 check is a required task in a Positive Lot Release inspection.  (Pl.'s SMF ¶ 33).  Despite her assertion that she had been trained to forego the MB 24/25 check for certain categories of products, she does not allege any specific facts concerning that alternative training.

---

[3] Kuc maintains that products that carried a BIGI, TOC, or HIP designation did not require MB 24/25 checks.  It is not entirely clear from the record what those designations indicate or what their significance is, except that she contends that she was under the impression that certain kinds of products—of which the product she inspected on March 10, 2016, was one—were not subject to the same inspection protocol as other products with respect to MB 24/25 checks.

Molina removed her from her inspection duties while he determined what remedial action to take.  (Molina Decl. ¶ 23).

###     5.     Kuc's Termination

On March 14, Molina submitted a memorandum to human resources recording the incident and recommending that Kuc be terminated.  (ECF No. 43-7).  Referring back to the December 2015 incident, Molina stated that she had repeatedly falsified inspection documents. (*Id.*).  He referred to company training records that indicated she had been trained on the Positive Lot Release procedure.  (*Id.*).  He then discussed what he believed was her deficient work performance in general, citing to her failure in March 2014 to conduct an MB 24/25 check, her bringing candy into the production area in February 2015, and what he referred to as her general resistance to accept responsibility for mistakes.  (*Id.*).  In Molina's opinion, she could no longer work in any quality-control capacity and her conduct represented a "high level compliance risk." (*Id.*).

On March 18, someone at Smith & Nephew drafted a termination letter for Dan Briggs's signature.  (ECF No. 54-1 at 44).  On March 22, Briggs signed that letter, and she was terminated, apparently effective April 1.  (*Id.*).

###     6.     Kuc's Claim of Handicap

In the meantime, on March 16, Kuc had requested a leave of absence to recuperate from the sudden onset of knee pain she allegedly experienced.  She did not specify whether she requested leave under the federal Family and Medical Leave Act ("FMLA"), a state statute, or both.

Kuc had requested, and been granted, FMLA leave on three prior occasions during her tenure with Smith & Nephew.  From November 2011 to November 2012, she took approximately three days of leave per month to care for her husband, who was recovering from a

stroke at that time. (Danchig Decl. ¶ 7; ECF No. 45-2 at 4). From April to June 2012, she took leave to recover from knee surgery. (Danchig Decl. ¶ 6; ECF No. 45-1 at 9; Kuc Decl. ¶ 23). She also was granted leave from April to July 2015 to recover from a neck injury. (Danchig Decl. ¶ 8; ECF No. 45-3; Kuc Decl. ¶ 23).

Six days after the March 10 incident, Kuc again applied for medical leave. (ECF No. 54-1 at 50). She provided the human resources department with a doctor's note, dated March 16, 2016, stating that she had suffered "sudden onset knee pain" beginning on March 11, the day after the incident. (*Id.* at 48; Kuc Decl. ¶ 24). According to the note, she "[could] not return to work until further notice." (ECF No. 54-1 at 48).

Kuc now asserts that her "various knee injuries [a]ffected my major life activities of standing, sitting, walking, concentrating, sleeping and other activities." (Kuc Decl. ¶ 25). Other than the doctor's note, which provides no detail, there is no medical evidence in the record. There is no evidence that she informed the company of ongoing knee pain prior to the submission of the leave request.

Her request for medical leave was denied on March 16. (ECF No. 54-1 at 50). The denial letter stated that her request "has been denied because you do not have available entitlement for this leave under FMLA and/or State leave programs." (*Id.*).

### 7.   Kuc's Allegations of Harassment

Kuc contends that she was subject to harassment at Smith & Nephew for two reasons: the deterioration of her friendship with a coworker, Linda Graziano, and her Polish origin.

First, Kuc contends that Graziano was the "mistress" of Kuc's manager at the time, Frank Bellomo. (Kuc Decl. ¶ 11). According to Kuc, she and Graziano had been "good friends," but "the deterioration of [their] relationship" put "a strain at work." (*Id.*). The acrimony led Glen Bauer, a supervisor who was allegedly "very good" friends with Bellomo, to harass her. (*Id.*).

She alleges that Bauer assigned her to a duty for which she was not trained with the aim of getting her fired.  (*Id.* ¶¶ 11-12).  She further alleges that she made "constant reports" concerning that conduct to human resources, without success.  (*Id.* at ¶ 13).

Second, Kuc contends that she was harassed on an almost daily basis while working at the company on the basis of her Polish national origin.  She alleges that from February 2013 to November 2014, Bauer played "racist, Polish" jokes from his computer, at a loud volume audible to her.  (*Id.* ¶ 15).  Bauer also allegedly deleted a Polish-to-English language translator file from the company computer to hinder her ability to communicate.  (*Id.* at ¶ 16).  She also alleges that during that time (2013-14) Bauer and another coworker, Brook Newcomb, regularly made jokes concerning her Polish heritage and mocked her accent.  (*Id.* at ¶ 17).  Bauer also allegedly cut Kuc's overtime hours, while many of her coworkers "worked many" hours of overtime each week.  (*Id.* ¶ 18).

According to Kuc, Graziano told coworkers that Kuc was "stupid," and that her employment was costing "good Americans" their jobs.  (*Id.* ¶ 19).  She also alleges that Graziano started a rumor in the office that Kuc was a lesbian.  (*Id.*).  In May 2013, Graziano and Kuc had a physical altercation in the break room.  (*Id.*).

Kuc further alleges that another coworker, Ron Roubochod, made comments that Polish people were "confused" and could not distinguish between holidays.  (*Id.* ¶ 22).  He also allegedly would "scream and yell" at her when training her.  (*Id.*).

She also alleges that another coworker, Wendy Black, "consistently and just about daily, by the end of [her] employment" harassed her.  (*Id.* ¶ 20).  She made comments about how immigrants took jobs away from Americans.  (*Id.*).  Black also allegedly said that Polish people were "stupid" and that she was "allergic" to them.  (*Id.*).  Kuc asserts that she reported Black to

human resources many times, although she does not provide details of any specific report made before 2015.  (*Id.* ¶ 21).

According to Kuc, such discriminatory treatment was not always directed at her; she alleges that on one occasion she witnessed Bauer and Newcomb comment that a Spanish engineer "smelled like a taco" and "was not very bright."  (*Id.* ¶ 22).

Kuc went out on medical leave in the spring of 2015 due to a neck injury.  When she returned in August, Bauer, Newcomb, Roubochod, Graziano, Black, and coworker Tom Perkins subjected her to disparaging comments about her accent, her facility with English, and her immigrant background.  (*Id.* ¶ 32).  She alleges that she reported that behavior to Bauer, her Quality Control Leader, who took no action.  (*Id.* ¶ 31).  When Bauer took no action, she "went to" Molina, the Quality Control Director, in November 2015.  (*Id.* ¶¶ 31, 34).  She then went to Carla Lemaire in Human Resources, who told her that Dan Briggs, the head of Human Resources, would "meet with [her]."  (*Id.* ¶ 35).

According to Kuc,

> I had a long discussion with Mr. Briggs at that time [November 2015] and talked to him about the problems I was having and their longstanding nature with Wendy Black, Linda Grazziano [*sic*], Tom Perkins and others.  I made it clear to him that these comments included regular and insulting statements about my Polish heritage, jokes made about Polish people, my accent, my ability to read and write English poorly in their opinion, and my status as an immigrant.  Mr. Briggs heard me out.  At no time did he ask me to put anything in writing.  He said he would look into it and he would talk to Brandon Molina.

(*Id.*).  According to Kuc, "[n]othing came of this complaint"; she was not questioned further, and there was no investigation.  (*Id.* ¶ 36).

Kuc alleges that she met again with Brandon Molina in early December 2015 to complain about her harassment, and that "he did not take much of an interest in the situation."  (*Id.* ¶ 37).  According to Kuc, Molina said that "he did not have time for this," and that "he thought all of

these problems were personal problems." (*Id.*).  She further alleges that she spoke twice with Briggs in December about the harassment, and that nothing happened in response.  (*Id.*).

On January 12, 2016, Kuc filed a written report of a verbal altercation she had with Black while working in the finals area.  (ECF No. 54-1 at 37-38).  In that report, she alleged that Black insulted her ability to understand English.  (*Id.*).  She also alleged that Black had harassed her on numerous past occasions, making derogatory comments concerning her Polish origin, her immigration status, and her English-language ability.  (*Id.*).

Molina and Briggs investigated the January 12, 2016 incident.  They interviewed Kuc, Black, and other individuals who may have witnessed the incident.  (Molina Decl. ¶ 4; Molina Dep. 88-89).  According to Molina and Briggs, Kuc's central complaint was that Black yelled at her.  (Briggs Decl. ¶ 18; Molina Dep. 91-93).  They did not perceive her complaint as alleging discriminatory harassment.  (*Id.*).

Kuc alleges that, in February 2016, she reported to Briggs that Perkins had been harassing her regularly.  (Kuc Decl. ¶ 46).  Specifically, she alleges that he called her names, said that she did not know how to work, and said that she was stupid.  (*Id.*).  He also allegedly made comments about her accent and threw papers around her workstation.  (*Id.*).  Briggs allegedly responded by telling Kuc that that was Perkins's personality and that he was a loud individual.  (*Id.* ¶ 47).  According to Kuc, Briggs said he would talk to Perkins about his behavior, but she is unsure if such a meeting ever took place.  (*Id.*).  In any event, Perkins's behavior allegedly did not change.  (*Id.*).

According to Kuc, before March 10, 2016, she again reported to Molina that Black, Perkins, and Bauer continued to make comments concerning her ethnicity, accent, and immigration status.  (*Id.* ¶ 48).  Molina allegedly responded that these were personal issues that

he did not want to hear about.  (*Id.*).  He then told Kuc to leave his office.  (*Id.*). When she

refused, Briggs allegedly came to Molina's office and had a lengthy discussion with Kuc and

Molina.  (*Id.* ¶ 49).  Kuc alleges that she again recounted for Molina and Briggs the harassment

she had endured for years concerning her national origin.  (*Id.* ¶ 49).

Around the time of her termination, Kuc alleges that she also reported these incidents to

the company's ethics hotline. (*Id.* ¶ 51).  She alleges that she made four calls reporting

harassment by Black and others.  (*Id.*).

### 8.    Kuc's Explanation for Her Job Performance

Kuc alleges that her work performance suffered partly because she undertook a role as a

quality control technician, which led to her being assigned new duties for which she had neither

been given appropriate instructions nor was properly trained.  (*Id.* ¶ 27).  She alleges that Bauer

and Bellomo assigned her to those duties so that she would fail at them.  (*Id.* ¶ 28).  According to

Kuc, as a result of those assignments, she received warnings concerning her performance.  (*Id.*

¶ 27).  She alleges that those warnings were the first negative assessments of her performance at

the company and that her previous years of service had passed without incident and earned her

positive performance reviews.  (*Id.* ¶ 28).

According to Kuc, the constant harassment also affected her job performance.  For

example, she states that the consistent harassment by Wendy Black "bothered me so much that I

had trouble concentrating at work."  (*Id.* ¶ 21).  She also said that by January 2016, she feared

she was "having a nervous breakdown" and "had difficulty keeping a focus on her job."  (*Id.*

¶ 29).  When she spoke with Dan Briggs in December 2015, she stated that "her mental state was

terrible" because of the harassment and that she "had difficulty focusing on her job."  (*Id.* ¶ 38).

### B.    Procedural Background

Kuc filed the complaint in this action on March 13, 2019, in Massachusetts Superior

Court.  Defendant removed the action to this Court on the basis of diversity jurisdiction.

The amended complaint alleges unlawful discrimination and termination on the basis of a disability in violation of Mass. Gen. Laws ch. 151B, § 4(16) (Count 1); unlawful discrimination and termination, as well as the creation of a hostile work environment, on the basis of national origin in violation of Mass. Gen. Laws ch. 151B, § 4(1) (Count 2); unlawful discriminatory retaliation for reporting discriminatory employment practices in violation of Mass. Gen. Laws ch. 151B, § 4(4), (4A) (Count 3); and unlawful discrimination and termination, as well as the creation of a hostile work environment, on the basis of sex in violation of Mass. Gen. Laws ch. 151B, § 4(1), (6A) (Count 4).

Defendant has now moved for summary judgment in its favor on all counts.

## II.   <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon

mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

III.  **Analysis**

A.  **Discrimination on the Basis of National Origin**

The complaint alleges that Kuc was subjected to a hostile work environment and terminated because of her national origin. Each of these allegations will be addressed in turn.

1.  **National Origin Discrimination—Hostile Work Environment**

Kuc contends that her coworkers made disparaging comments concerning her Polish origin, creating a hostile work environment that the company was aware of, yet did nothing to dispel.

Under Massachusetts law, "[c]hapter 151B provides a cause of action for a hostile work environment based on the cumulative effect of a series of abusive acts though each in isolation might not be actionable in itself." *Chery v. Sears, Roebuck & Co.*, 98 F. Supp. 3d 179, 191 (D. Mass. 2015); *see Windross v. Village Auto. Grp., Inc.*, 71 Mass. App. Ct. 861, 863 (2008).  A hostile work environment is one so "pervaded by harassment or abuse," resulting in an atmosphere of "intimidation, humiliation, and stigmatization," such that it "poses a formidable barrier to the full participation of the individual in the workplace." *Thompson v. Coca-Cola Co.*, 522 F. 3d 168, 180 (1st Cir. 2008) (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001)).  The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." *Noviello v. City of Bos.*, 398 F. 3d 76, 92 (1st Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).   To determine whether a reasonable person would find the alleged conduct offensive, courts consider the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Faragher*, 524 U.S. at 787-88).

"Finally, a plaintiff must establish 'some basis for employer liability' to prevail on a hostile work environment claim." *Chery*, 98 F. Supp. at 191-92 (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 228 (1st Cir. 2007)).  When the hostile work environment results from harassment caused by a co-worker, a plaintiff must demonstrate that the employer had notice of the harassing conduct and yet failed to take prompt and appropriate action.  *Forrest*, 511 F.3d at 230-31.  Employers may also be held liable if a plaintiff can demonstrate that her supervisor was responsible for the harassment that created the hostile work environment. *Noviello*, 398 F. 3d at 95 (citing *College-Town, Div. of Interco, Inc. v. MCAD*, 400 Mass. 156, 165 (1987)).

Here, the record contains evidence of multiple incidents where Kuc was belittled and mocked for being Polish.  (*See, e.g.*, Kuc Decl. ¶¶ 15-17, 20, 22, 30, 32, 39-40; ECF 54-1 at 37). It also contains evidence that Kuc reported that treatment to her supervisors.  (Kuc Decl. ¶¶ 21, 31, 33, 34-35, 37, 41-46, 48-49; ECF 54-1 at 37).  She also contends that Bauer, who allegedly contributed to the discriminatory environment, was her supervisor.  (Opp'n at 13).[4]  Taken together, that evidence is sufficient to create an issue of material fact as to whether Kuc was subjected to a hostile work environment because of her national origin and whether Smith & Nephew had notice that such an environment existed.

Smith & Nephew contends that the Court should disregard as untimely many of the

---

[4] Kuc fails to cite to record support for that contention, but the record does show that Bauer was a team leader in the department, ostensibly exercising some authority or control over other employees.  (*See* Kuc Decl. ¶31; ECF No. 54-1 at 35; Molina Dep. at 74).  It does appear, at least, that Bauer's authority is a disputed issue of material fact, and the issue will therefore be construed in Kuc's favor.

alleged incidents of harassment that could be construed as contributing to a hostile work environment.  Because Kuc, according to the company, did not file a charge of discrimination with the Massachusetts Commission Against Discrimination until October 25, 2016, and because chapter 151B requires a charge be filed within 300 days of the alleged discriminatory event, the company argues that any claim based on alleged harassment that occurred before December 30, 2015, should be time-barred.  (Mem. Summ. J. at 17).

However, allegations of a hostile work environment differ from other claims of discrimination where a single incident can give rise to a cause of action.  A hostile work environment can result from a series of minor incidents that "in isolation may not be serious enough for a complaint."  *Cuddyer*, 434 Mass. at 532-33.  As a result, some claims for a hostile work environment may only emerge when such events are linked together, revealing "a prolonged and compelling pattern of mistreatment . . . ."  *Id.* at 533.  Massachusetts courts, therefore, follow the "continuing violation doctrine," which allows a plaintiff to establish a timely hostile work environment claim so long as she can establish (1) that she was forced to work in a hostile work environment and (2) that one of the incidents of harassment, substantially related to the prior harassment and substantially contributing to the continuation of the hostile work environment, occurred during the limitation period, thereby rendering the entire claim timely.  *See id.*

Here, Kuc's personnel file details an incident that occurred on January 12, 2016, where she reported that Black harassed her for her foreign accent and her difficulty in speaking English; she also reported that the harassment had been an ongoing issue and that she had reported it to her superiors and human resources.  (ECF No. 54-1 at 37).  In addition, her declaration describes incidents in February and March 2016 where she experienced and reported harassment based on

her national origin.  (Kuc Decl. ¶¶ 46-51).  Those alleged incidents anchor her hostile work environment claim within the limitations period, and Smith & Nephew's contention that incidents prior to December 30, 2015, are time-barred is unavailing.

The company also contends that the Court should disregard the allegations of harassment contained in Kuc's declaration, which was filed with her opposition to summary judgment. According to the company, Kuc had been questioned at length during her deposition about each alleged incident of discriminatory harassment, and never identified a timely incident other than her confrontation with a coworker on January 12, 2016.  (Reply at 11).  The allegations of harassment occurring in February and March 2016, the company argues, are "newfound allegations" that "cannot form the basis of a material factual dispute to prevent summary judgment."  (*Id.*).  However, for reasons discussed, the factual dispute concerning the January incident is alone sufficient to render the incidents occurring before that date timely.

Moreover, the company has failed to demonstrate that Kuc's declaration contradicts her deposition testimony to such a degree that the Court should disregard it for the purposes of summary judgment.  It is true that a party cannot manufacture a genuine issue of fact to survive summary judgment by submitting a declaration that clearly contradicts earlier sworn testimony, particularly when the deposition testimony provides "clear answers to unambiguous questions." *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 30 (1st Cir. 2019) (quoting *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994)).  However, it is by no means clear that Kuc's declaration contradicts her deposition testimony.  The company cites to no part of her testimony or her declaration to demonstrate where they conflict.  In addition, the deposition excerpts provided by Smith & Nephew fail to show any clear contradiction of the declaration.  Therefore, the Court will consider the declaration part of the record and concludes that disputes of material

fact preclude summary judgment.

Summary judgment on Kuc's claim of a hostile work environment on the basis of national origin will therefore be denied.

### 2. National Origin Discrimination—Termination

The complaint also alleges the Kuc was unlawfully terminated because of her national origin.

Under Massachusetts law, it is unlawful for an employer to terminate an employee because of her national origin. Mass. Gen. Laws ch. 151B, § 4(1). When assessing claims of workplace discrimination that rely upon circumstantial evidence, Massachusetts courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Gannon v. City of Bos.*, 476 Mass. 786, 793 (2017). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the proffered reason was mere pretext, and that the true reason was unlawful discrimination. *Id.* at 34.[5]

#### a. *Prima Facie* Case

A *prima facie* case of disparate treatment requires that a plaintiff provide evidence that (1) she is a member of protected class, (2) she performed her job at an acceptable level, and (3)

---

[5] Massachusetts is a "pretext-only" jurisdiction, meaning that a "plaintiff need only present evidence from which a reasonable jury could infer that 'the respondent's facially proper reasons given for its action against him were not the real reasons for that action.'" *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681-82 (2016) (quoting *Wheelock Coll. v. MCAD*, 371 Mass. 130, 139 (1976)).

she was terminated.  *Bulwer*, 473 Mass. at 681. [6]  It is undisputed that Kuc was born in Poland

and that she was fired.  To establish a *prima facie* case, therefore, Kuc must provide evidence

that she performed her job at an acceptable level.

Smith & Nephew contends that Kuc cannot make such a showing given her history of

repeatedly violating inspection protocols.  In opposition, Kuc argues that she performed her job

capably and that any shortcomings in her work were the consequence of the hostile work

environment she endured.

The record contains evidence that Kuc did, at least for a time, perform her job

satisfactorily.  Specifically, her yearly reviews in 2011, 2012, and 2013 stated that her overall

performance consistently met expectations.  (ECF No. 54-1 at 7-25).  However, the stated

grounds for her termination—that is, the failure to perform inspections correctly and the repeated

falsification of records—occurred after March 2014, and she must show that she performed her

job satisfactorily at the time of her termination.  *See Caraballo-Caraballo v. Correctional

Admin.*, 892 F.3d 53, 59-60 (1st Cir. 2018) (stating that in discharge cases a plaintiff's ability to

state a *prima facie* case depends on her ability to show she performed her job adequately at the

time of her discharge).

As set forth above, Smith & Nephew has submitted substantial evidence in support of its

contentions that Kuc performed her job inadequately from 2014 onward.  There is evidence that

---

[6] In some cases, Massachusetts courts have required a fourth element of the *prima facie* case whereby a
plaintiff must identify comparators or demonstrate that the position she held "otherwise remained open to her."
*Gannon*, 476 Mass. at 793.  In such contexts, the Supreme Judicial Court has explained that the "necessary
showing" as to that possible fourth element varies "depending on the specific circumstances of each case." *Id.* at
793 n.6.  In other cases, the Supreme Judicial Court has dispensed with the fourth element altogether and articulated
a standard comprising the first three elements only.  *See Bulwer*, 473 Mass. at 681.  In light of that inconsistency in
Massachusetts case law, the Court will follow the three-part test set forth in *Bulwer*.  As a result, defendant's
contention that plaintiff fails to state a *prima facia* case for discrimination because she failed to identify comparators
will be disregarded for the purposes of summary judgment.

she failed to follow inspection protocols, falsified internal company records, and resisted efforts to correct her problems.

Nevertheless, the Court will assume for the purposes of summary judgment that Kuc has stated a *prima facie* case.  She disputes the company's characterization of her work performance, stating that she performed the tasks as she had been trained or that certain errors were not her fault.  She also contends that Bauer and Bellomo assigned her to tasks for which she was not properly trained so that she would fail and provide the company with cause for her termination.  Furthermore, her disparate-treatment claim does not stand in isolation, as she alleges that the hostile work environment she endured had a deleterious effect upon her work performance and that prior to that harassment she had been a competent employee.  The record does show that she was a minimally proficient, yet satisfactory, employee until she allegedly began experiencing unlawful discrimination at work.  Finally, the Court recognizes that stating a *prima facie* case "is meant to be a 'small showing' that is 'easily made.'"  *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (quoting *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).  Thus, the Court will assume for present purposes that Kuc has met that burden here.

### b.     Legitimate, Non-Discriminatory Reasons for Termination

The burden then shifts to the company to proffer evidence of a legitimate, non-discriminatory reason for the termination. According to Smith & Nephew, it fired Kuc following the March 2016 incident on the grounds that she had falsified inspection documents and failed to follow inspection protocols.

On March 14, 2016, Molina submitted a memorandum to human resources to provide a written record of the March 10 violation and recommend that Kuc be terminated.  (ECF No. 43-7).  He asserted that she had a history of unsatisfactory work performance.  (*Id.*)  As noted in that memorandum, Kuc had been counseled for falsifying records following the December 2015

incident.  (*Id.*).  She was told at that time that falsifying records in the future would lead to her

termination.  (ECF No. 43-4).  In addition, Molina noted that she had a history of failing to

perform required MB 24/25 checks, as evidenced by the March 2014 incident where she

approved a product that was missing material.  (ECF Nos. 42-7 at 44, 43-7, 44-1 at 3).[7]

Considering those repeated violations of inspection protocol, as well as her unwillingness to

accept responsibility for her errors, Molina determined that Kuc "could not be relied upon to

perform any quality function" and that she posed a "high level compliance risk."  (ECF No. 43-

7).  As a result, he recommended her immediate dismissal.  (*Id.*).  The company terminated her

soon thereafter.  (ECF No. 54-1 at 44).

Accordingly, the company has stated legitimate, non-discriminatory reasons for Kuc's

termination.

### c.   Pretext

The burden then shifts back to Kuc to demonstrate that the company's stated reasons for

terminating her were a pretext for discrimination.  Kuc contends generally that the company's

reasons for firing her were pretextual because the errors that she committed were common and

that issues with her performance were noted only after a change in supervisor.

Under Massachusetts law, a plaintiff "need only present evidence from which a

reasonable jury could infer that 'the [defendant's] facially proper reasons given for its action

against [her] were not the real reasons for that action.'"  *Bulwer*, 473 Mass. at 681-82 (quoting

*Wheelock Coll.*, 371 Mass. at 139.  "An employee can establish pretext by showing weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

---

[7] There had also been at least one incident of her bringing food into her production area, which was prohibited.  (ECF No. 43-7).

legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 37 (1st Cir. 2010) (quotations marks and emphasis omitted).

Kuc's evidence of pretext is not compelling, but, construing the facts in her favor, and considering the lenient standard under Massachusetts law, there is evidence from which a reasonable fact-finder could infer that the company's stated reasons were pretextual.

There is evidence in the record suggesting that employees occasionally made mistakes when performing the MB 24/25 check.  In an email from Bauer to Briggs concerning Kuc's failure to conduct an MB 24/25 inspection in July 2014, Bauer wrote that normally an inspector might have two or three similar errors over the course of a year.  (ECF No. 54-1 at 53).[8]  In addition, Black testified that she had once made an MB 24/25 error and was not disciplined.  (Black Dep. at 56-60).

Furthermore, some of the company employees involved in Kuc's termination were co-workers and supervisors that were allegedly responsible for her discriminatory treatment.  The initial email reporting Kuc's failure to conduct an MB 24/25 inspection on March 10, 2016, originated from Bauer, who she alleges had been harassing her for years.  (ECF No. 43-5 at 3). The memorandum for her termination was authored by Molina and approved by Briggs, both of whom were allegedly aware of the discriminatory environment.  As for Molina, Kuc alleges that he told her that she was stupid and needed to translate what she was saying into English, an allegation that could be construed as revealing discriminatory animus on the part of a supervisor involved in the decision to terminate her.  (Kuc Dep. at 139-40).  As for the December 2015 incident, Kuc alleges that Perkins, one of her coworkers who had allegedly harassed her,

---

[8] That same email also referred to eight such errors that Kuc had committed thus far that year.  (*Id.*).

23

reported her for failing to complete the Data Collection Form.  (Kuc Decl. ¶ 65).  She was then confronted by Bauer, who took the matter to Molina, which resulted in her being counseled that falsifying documents in the future would lead to her termination.  (ECF Nos. 43-4; 43-7 at 4).

When determining whether an employer's stated reason for terminating an employee was pretextual, "the biases of those who . . . make or influence the employment decision are probative."  *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85 (1st Cir. 2004).  And the inquiry into the employer's true motive "need not artificially be limited to the particular officer who carried out the action."  *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1342 (1st Cir. 1988).  Rather, courts examine whether the decision to terminate the employee was based on information that may have been tainted by discriminatory animus.  *See Cariglia*, 363 F.3d at 88 (holding that an employee who withheld exculpatory information, because of discriminatory animus, thus contributing to coworker's termination, "impermissibly tainted" the termination decision).

Here, viewing the facts in favor of Kuc, a reasonable factfinder could conclude that her performance issues were infected by discriminatory animus and that they affected the company's decision to terminate her.  Under the circumstances, there is sufficient record evidence from which to infer pretext.

Accordingly, the motion for summary judgment on Kuc's claim of disparate treatment based on national origin will be denied.

**B.**     **Retaliation**

The complaint also alleges that Kuc was terminated in retaliation for reporting discriminatory harassment.

Chapter 151B provides that the following are unlawful practices:

For any person, employer, labor organization or employment agency to discharge,

expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

. . .

For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

Mass. Gen. Laws. ch. 151B, § 4(4), (4A).

The Court will first address the allegation that the company terminated Kuc in retaliation for her reports of discriminatory harassment and then address the allegation of a retaliatory hostile work environment.

### 1.    <u>Retaliation—Termination</u>

When assessing allegations of retaliation based on circumstantial evidence, Massachusetts courts employ the *McDonnell Douglas* framework.  *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 406 (2016).

To establish a *prima facie* case of retaliation under chapter 151B, a plaintiff must show that (1) she engaged in protected conduct, (2) she endured some adverse employment action, and (3) the protected conduct and the adverse action were causally linked.  *See Xiaoyan v. Citizens Bank, N.A.*, 821 F. 3d 206, 218-19 (1st Cir. 2016); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707 (2011).  "To defeat summary judgement, the plaintiff need not prove retaliation by a preponderance of the evidence."  *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015).  "All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action."  *Collazo v. Bristol-Myers Squib Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010) (alteration in original) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

The burden then shifts to the employer to state a legitimate, non-retaliatory reason for Kuc's termination. *See Verdrager*, 474 Mass. at 406. If the employer meets that burden, the employee must produce evidence that the employer's "stated reason for terminating her was a pretext for retaliating against her" because of her protected activity. *Esler v. Sylvia-Reardon*, 473 Mass. 775, 780 n.7 (2016). "The combination of a *prima facie* case of retaliation with a showing of pretext allows a jury to infer that there was no legitimate explanation for the adverse [employment] decision and that the employer's true motivation was retaliatory." *Verdrager*, 474 Mass. at 406 (alteration in original) (quotation marks omitted).

As a threshold matter, it is necessary to attempt to extricate Kuc's allegations of unlawful retaliation from extraneous allegations that do not bear upon her legal claims or are unsupported by evidence.

Kuc asserts that she was subjected to numerous adverse employment actions prior to her termination—specifically, the warnings she received for her performance and her reassignment to different quality-control tasks. However, she argues that those "adverse actions" were the result of a personal conflict between her and a "cabal of individuals" who disliked her within the department, not because of any protected activity. (Opp'n at 15). Harassing conduct motivated by personal conflict does not, however, give rise to a claim for retaliation.

Kuc also contends that she began reporting incidents of unlawful harassment to her supervisors as early as 2013. She has submitted no specific details to support that allegation. She simply avers that over an unspecified period of "constant harassment" she made "constant reports" to human resources personnel. (Kuc Decl. ¶ 13). She also contends that she made several unspecified reports to human resources at unspecified times prior to the summer of 2015. (*Id.* ¶ 21). Such blanket statements, without more, are not sufficiently specific to demonstrate a

genuine dispute of material fact.  *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995) (stating that a party opposing summary judgment "must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.").

Kuc also contends that the temporal proximity between her written complaint in January 2016 and her termination in March 2016 are sufficient to establish a causal relationship linking the two together.  The company does not contest, at least for the purposes of summary judgment, that Kuc engaged in protected conduct or that she was terminated.  However, Smith & Nephew contends that she cannot show a nexus between the protected conduct and her termination because her performance issues predated her January 2016 complaint of discriminatory harassment.

"That an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation."  *Mole v. Univ. of Mass.*, 442 Mass. 582, 592 (2004).  However, if the employer takes an adverse action against "a satisfactorily performing employee" immediately after the employer becomes aware of the employee's protected activity, "an inference of causation is permissible."  *Id.*  A period as short as two months between allegations of discrimination and an adverse action appears sufficient to "meet the relatively light burden of establishing a *prima facie* case of retaliation."  *Mariani-Colón v. Dept. of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007).

That said, if the "adverse employment actions or other problems with an employee" predate the employer's knowledge of the protected conduct, "it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation."  *Mole*, 442 Mass. at 594.

Under the circumstances, the Court concludes that there is a disputed issue of material

fact as to whether Kuc was a satisfactorily performing employee at the time she engaged in protected conduct.  Although issues with her work performance predated her January 2016 written complaint, they do not necessarily predate her alleged November 2015 reports of unlawful discrimination to Molina, Lemaire, and Briggs.  Approximately one month later, in December 2015, her failure to properly complete the Data Collection Form resulted in a written warning and an admonishment that a future infraction of protocol would lead to her termination.[9] In January 2016, she recorded her allegations of unlawful discrimination in a written complaint, and, approximately two months later, she was terminated for the March 2016 incident.  Taken together, a reasonable jury could find a causal connection between her reports of unlawful discrimination and the company's disciplinary actions because of their close temporal proximity.

The burden then shifts to Smith & Nephew to proffer a legitimate, non-retaliatory reason for Kuc's termination.  As discussed, the company has met that burden by stating that her falsification of records and repeated inspection failures were the basis for her termination.

The burden then shifts back again to Kuc to show that the company's stated reasons were pretextual.  "For a plaintiff to 'impugn the veracity' of the employer's proffered reason is insufficient; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive."  *Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014) (quoting *Mesnick*, 950 F.2d at 824).  Plaintiff may use the same evidence she proffered to state a *prima facie* case for retaliation to demonstrate pretext, as well.  *Fournier v. Massachusetts*, 2021 WL 4191942, at *4 n.3 (1st Cir. Sept. 15, 2021).

---

[9] It appears that under Massachusetts law, oral and written warnings concerning an employee's performance can constitute an adverse action for the purposes of a retaliation claim.  *O'Brien v. Massachusetts Inst. of Tech.*, 82 Mass. App. Ct. 905, 909 (2012).

Kuc contends that the company's stated reasons for her termination were pretextual because other employees occasionally made mistakes when checking the MB 24/25 database. That, in conjunction with the temporal proximity between her complaints to human resources and the company's adverse actions (the written warning and her termination) is sufficient evidence from which a reasonable factfinder could infer that the company's stated reasons for termination were pretextual. *See Fournier*, 2021 WL 4191942, at *4 (holding that, despite record of employee's poor work performance, close temporal proximity between report of alleged discriminatory harassment and termination was sufficient to show pretext). *But see Planadeball*, 793 F.3d at 179 (stating that two-month period between protected conduct and adverse action was, by itself, not sufficient to raise an inference of pretext).

Therefore, summary judgment on Kuc's claim for retaliatory termination will be denied.

### 2. Retaliation—Hostile Work Environment

Kuc also contends that she was subjected to a hostile work environment in retaliation for reporting unlawful discrimination in the workplace. That claim is different from her claim that she was generally subjected to a hostile work environment on the basis of her national origin—it is a claim of retaliation, not mere harassment.

The framework for stating a claim based on a hostile work environment is "readily transferable to the retaliatory harassment context." *Noviello*, 398 F.3d at 92. However, the harassment directed at the plaintiff must "stem from a retaliatory animus." *Id.* at 93. Kuc has made no such showing here. There is no evidence—or at least she has pointed to none—that any of the harassment to which she was subjected occurred in retaliation for her reporting unlawful workplace discrimination. Although she has made a sufficient showing of a hostile work environment based on national origin, more is required to show a claim of retaliation. She has not provided an argument, bolstered by specific factual support, demonstrating that she engaged

in protected activity and that retaliatory harassment ensued as a result.

Accordingly, summary judgment as to the claim of a retaliatory hostile work environment will be granted.

### B.      Handicap Discrimination

The complaint alleges that Smith & Nephew unlawfully discriminated against Kuc on the basis of handicap.  She contends that her handicap is severe knee pain that prevented her from working for an indefinite period.

Under Massachusetts law, it is unlawful for an employer

> . . . to dismiss from employment or refuse to hire, rehire or advance in
> employment or otherwise discriminate against, because of his handicap, any
> person alleging to be a qualified handicapped person, capable of performing the
> essential functions of the position involved with reasonable accommodation,
> unless the employer can demonstrate that the accommodation required to be made
> to the physical or mental limitations of the person would impose an undue
> hardship to the employer's business.

Mass. Gen. Laws ch. 151B, § 4(16).  "Chapter 151B is considered the 'Massachusetts analogue' to the [ADA]."  *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009). Massachusetts courts therefore "look to the federal cases decided under the ADA as a guide to the interpretation of [chapter] 151B."  *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 451 n.6 (2002).

The complaint alleges that following the March 10 incident that led to her termination, Kuc provided to the company a doctor's note stating that she suffered from a "sudden onset" of knee pain, which began on March 11.  (Am. Compl. ¶ 35; ECF No. 54-1 at 48).  The complaint also details previous instances during her employment with the company when she took FMLA leave due to injuries she suffered or to take care of her spouse.  (Am. Compl. ¶¶ 22, 34).  The complaint then alleges:

> As a direct result of the time Mrs. Kuc missed because of these injuries,

particularly the lengthy time she missed in 2015 because of her neck injury and because she was now looking for time out of work again for her long-standing knee injury, she was discharged.

(Am. Compl. ¶ 37).  Kuc repeats this allegation, nearly verbatim, in her declaration.  (Kuc Decl. ¶ 26).  She then repeats the allegation in her opposition brief.  (Opp'n at 5).  Moreover, she contends in her opposition that the termination process was accelerated after she submitted the doctor's note and human resources became aware of her leave request.  (Opp'n at 18).

Kuc does not allege that she was denied, or that she even requested, a reasonable accommodation for her alleged handicap.  Perhaps more importantly, she has put forth no evidence that she is a "qualified handicapped person."  She offers no evidence that she was capable of performing the essential functions of her job notwithstanding her knee pain, nor any evidence that her handicap could have been reasonably accommodated in any particular way.  To the extent, therefore, that her claim of handicap discrimination is based on a failure to make reasonable accommodation, summary judgment is appropriate.

Kuc does, however, allege that she was terminated because she requested leave—specifically, the complaint alleges that she was a "qualified handicapped person who was terminated by the Defendant on April 1, 2016 after having given the Defendant notice of her need for a leave of absence because of her handicap."  (Am. Compl. ¶ 44).  That aspect of her claim of handicap discrimination is thus a retaliation claim:  that is, a claim that she was terminated because she exercised her right to request medical leave.

Her evidence supporting that claim is based almost entirely on the timing of events—that she sought a leave of absence on March 16, and was terminated several days thereafter.  Furthermore, the portion of her opposition brief addressing her claim of handicap discrimination concludes by referring to the elements for a *prima facie* case of retaliation:

There seemingly was no rush for the defendant to fire Mrs. Kuc after the March

10th incident, but everything sped up on the 16th when the doctor's note arrived. There seems to be a clear causal relation, one to be determined by a jury, between the protected activity and the discharge.

(Opp'n at 18).

There is no question that federal law prohibits employers from retaliating against employees who seek to exercise their FMLA rights.  29 U.S.C. § 2615(a); *see Henry v. United Bank*, 686 F.3d 50, 55 (1st Cir. 2012) ("The [FMLA] also prohibits employers from retaliating against employees for exercising their statutory rights.").  However, the complaint does not allege a federal claim.  Instead, it purports to assert a claim under Mass. Gen. Laws ch. 151B, § 4(16).  The question is thus whether Massachusetts law as of 2016 provided a right of action for retaliation for seeking medical leave.

To begin, there is nothing in chapter 151B that expressly provides for a cause of action to redress retaliation against employees seeking to take medical leave.  The statute provides protections for employees seeking to take pregnancy-related leave or parental leave pursuant to Mass. Gen. Laws ch. 149, § 105D.  *See* Mass. Gen. Laws ch. 151B, § 4(1E)(a), (11A).  It does not, however, provide protection against retaliation for requesting other forms of leave.  If there is a basis to imply a cause of action for retaliation under chapter 151B, plaintiff has not attempted to make that argument.[10]

Chapter 151B does contain a provision that prohibits employers from discharging, expelling, or otherwise discriminating against "any person because he has opposed any practices

---

[10]  As a matter of statutory construction, such an argument would be unlikely to succeed.  Among other things, the legislature knows how to address retaliation when it intends to do so; multiple Massachusetts statutes expressly provide recourse for employees who are retaliated against for exercising workplace rights.  *See, e.g.*, Mass. Gen. Laws ch. 149, § 52E(i) (prohibiting retaliation against employee taking leave when employee or family member has been victim of domestic abuse); Mass. Gen. Laws ch. 149, § 148C(h) (prohibiting retaliation for employees exercising rights under paid sick time statute); Mass. Gen. Laws ch. 152, § 75B(2) (prohibiting retaliation against employees who file worker's compensation claims); Mass. Gen. Laws. ch. 175M, § 9(a) (prohibiting retaliation against employees who take paid family or medical leave).

forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five [that is, an MCAD proceeding]."  Mass. Gen. Laws ch. 151B, § 4(4).  That section provides recourse for employees who are retaliated against for engaging in activities protected by that statute.  Such protected activities, within the context of handicap discrimination, include the requesting of reasonable accommodations, *see, e.g.*, *Finnegan v. CSX Transp., Inc.*, 368 F. Supp. 3d 263, 291 (D. Mass. 2019), or the filing of a complaint with the Massachusetts Commission Against Discrimination, *see, e.g.*, *Callbeck v. Fallon Cmty. Health Plan, Inc.*, 480 F. Supp. 3d 308, 314 (D. Mass. 2020).  Requesting medical leave, however, is not one of those activities, and plaintiff does not claim otherwise.

Nothing in the complaint or her opposition states or suggests that she is seeking redress under any provision of state law other than chapter 151B.  The Massachusetts Paid Family and Medical Leave Act, Mass. Gen. Laws ch. 175M, contains an express provision prohibiting employers from retaliating against employees who exercise their rights under the statute.  Mass. Gen. Laws ch. 175M, § 9(a).  But that statute did not take effect until January 2021.  Kuc was terminated in 2016 and filed this lawsuit in 2019.  She has not attempted to invoke the provisions of that statute, or even mention its existence.  And if there is a reason that it should apply retroactively to her circumstances, she has not attempted to make that argument.[11]

In short, Count 1 alleges handicap discrimination, but Kuc has not attempted to demonstrate that she was a qualified handicapped person or that she requested or was denied a

---

[11] The Massachusetts Small Necessities Leave Act, although incorporating FMLA provisions, provides for only a day of leave per year, in addition to the leave guaranteed by FMLA, so that employees can fulfill specific family obligations.  Mass. Gen. Laws ch. 149, § 52D.  Nothing in that statute suggests that it provides an alternative avenue for bringing a FMLA claim.  *See Mellen v. Trustees of Bos. Univ.*, 504 F.3d 21, 24-25, 27-28 (1st Cir. 2007) (examining separately claims for miscalculation of FMLA and SNLA leave).  Moreover, bringing a cause of action under SNLA requires an "aggrieved party" to file a complaint with the Massachusetts Attorney General before bringing a cause of action.  Mass. Gen. Laws ch. 149, § 150.  There is no evidence that Kuc filed such a complaint here.

reasonable accommodation.  Instead, in substance, she alleges a claim of retaliation—she claims

that she was terminated for requesting leave following the March 10 incident and for having

taken FMLA leave in the past.  However, she does not assert a federal claim for retaliation under

FMLA.  Her claim is instead asserted under state law, specifically chapter 151B.  But that statute

does not provide recourse for an employee who suffers retaliation for seeking medical leave.

Another state statute, chapter 175M, now provides such recourse for those who request leave

under state law.  However, it was enacted long after the incident in question, and plaintiff neither

cites that statute nor attempts to show why it should apply.

A plaintiff seeking to recover damages is required to do more than make perfunctory or

vague references to the law.  "Judges are not expected to be mindreaders.  Consequently, a

litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold

its peace."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (quotation marks omitted)

(quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).  Here, the claim of

handicap discrimination, as pleaded and argued, cannot stand.

Accordingly, summary judgment will be granted as to Count 1.

## C.   Discrimination on the Basis of Sex

The complaint further alleges that Kuc was terminated and endured a hostile work

environment because of her sex.[12]

### 1.   Sex Discrimination—Termination

The complaint alleges that Kuc was terminated because of her sex.  The company

contends that Kuc cannot establish a *prima facie* case of sex-based discrimination, nor can she

show that the legitimate, non-discriminatory reasons for her termination were pretextual.  (Mem.

---

[12] Kuc's opposition memorandum states in passing that she was also unlawfully terminated on the basis of age.  The complaint does not allege such a claim, and the Court will therefore not consider it.

Summ. J. at 10-15).  She has failed to respond to those arguments.

The only record evidence that can be construed as supporting a claim of se-based discrimination is Kuc's allegation that at some point—apparently in 2013 or 2014—Graziano started a rumor that Kuc was a lesbian.[13]  But there is no evidence that the rumor played any role in her termination.  Furthermore, Graziano was a co-worker, not a supervisor, and there is no evidence any superior was even aware of the rumor.

Accordingly, summary judgment will be granted in favor of the company to the extent Kuc alleges a disparate treatment claim based on gender.

### 2.        Sex Discrimination—Hostile Work Environment

As discussed, a plaintiff alleging a hostile work environment must demonstrate an environment "pervaded by harassment or abuse."  *Cuddyer*, 434 Mass. at 532.  To determine whether a work environment is sufficiently hostile or abusive, courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher*, 524 U.S. at 787-88.

Here, Kuc's allegation that a coworker initiated a rumor that she was a lesbian is insufficient to establish a claim of hostile work environment based on sex discrimination.  *See e.g.*, *Pomales v. Celulares*, 447 F.3d 79, 83-84 (1st Cir. 2006) (stating that single incident of crude conduct did not "provide sufficient basis from which a reasonable factfinder could conclude [plaintiff] was subjected to a hostile work environment"); *cf. Noviello*, 398 F.3d at 92 ([R]udeness or ostracism, standing alone, usually is not enough to support a hostile work

---

[13] It is not clear whether Kuc contends that she was discriminated against based on gender or sexual orientation; regardless, chapter 151B forbids discrimination on either basis.  Mass Gen. Laws ch. 151B, § 4(1).

environment claim.").

Furthermore, Kuc must establish "some basis for employer liability" to state a viable claim. *Chery*, 98 F. Supp. at 191-92. Again, there is no evidence that Graziano was her supervisor or superior, nor is there evidence that Kuc complained to the company about Graziano's comments concerning her sexual orientation.

Summary judgment on Kuc's claim of a hostile work environment on the basis of sex will therefore be granted.

## IV.  <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is DENIED as to plaintiff's claims of (1) national-origin discrimination, resulting in (a) a hostile work environment and (b) termination (Count 2); and (2) retaliation for complaining about a hostile work environment, resulting in termination (Count 3), and is otherwise GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  February 14, 2022

36